## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ERNEST McCLOUD,

       Plaintiff,

v.                              No. CIV 05-728 LFG

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Ernest McCloud ("McCloud") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that McCloud was not eligible for disability insurance benefits ("DIB"). McCloud moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. No. 13.]

## Background

McCloud, an African-American male, was born on September 20, 1945. [Tr. at 265.] He currently lives alone but has been married and divorced four times. He has five children, with whom he has no contact. [Tr. at 61, 98, 134.] McCloud completed high school and two years of college. [Tr. at 74, 265.] He served in the United States Army from 1967 to 1969, and was stationed in Bawon, Vietnam in 1968 and 1969, during which time he saw combat, including mortar fights. [Tr.

1

204, 205.]  Related to his military service in Vietnam, McCloud states that he received the Purple

Heart three times, the Bronze Star, the Silver Star and other awards.[1]  [Tr. at 206.]

McCloud has had difficulties maintaining a job.  [Tr. at 205.]  He lost count of how many jobs

he has held but states that he had had over ten jobs.  [Tr. at 205.]  McCloud is somewhat inconsistent

in describing his job history, but most recently, he worked for a cable company as a "cable helper"

from 1996 until February 1998.  [Tr. at 86, 89.]  From about 1994-1995, he was an assistant

supervisor during the night shift for a ceramic tile company.  [Tr. at 86, 266.]  The job he held the

longest was as a delivery driver for Oasis Irrigation Supply in California during the years 1983-1988.

[Tr. at 86-89.]  McCloud did not work from 1974-1976.  He worked sporadically from 1977-1988,

during which time he worked for many different employers and had periods of unemployment.  [Tr.

at 62.]  McCloud's past relevant work was as a delivery driver, an oil field truck driver, a cable

helper, and a supervisor.  [Tr. at 69, 86-89, 123, 265-267.]

Even though McCloud has not worked since February 1998, he did not file his application for

DIB until mid-2003, alleging that he was "unable to work because of [his] disabling condition on

February 15, 1998."[2]  [Tr. at 60.]  McCloud alleged that he was disabled due to post-traumatic stress

syndrome ("PTSD"), a sleep disorder, impairments in both knees, and impairments or dislocation of

---

[1]It is not always clear from the administrative record whether McCloud's rendition of his history is accurate.  He asserts that he is a highly decorated combat veteran.  He provided no verification of his military service, awards, military occupation speciality ("mos") by way of a DD-214 form.

He told one medical provider that he had a Bachelors Degree in education, and yet others that he had a two-year degree.  He claims to have played football in the NFL even though he had leg or knee injuries requiring multiple surgeries.  He asserts that he was in a "special ops" unit in the Green Berets.  [Tr. at 139.]  None of this was substantiated and remains unconfirmed.  It does not appear, based on other records, that McCloud attained a Bachelor's Degree.  However, a letter from the VA, dated October 20, 2005 (attached to Plaintiff's pleadings) indicates that McCloud received at least one purple heart award, but in other statements, he claims three purple hearts.  [See Doc. No. 14, Ex. A "cc: Military Order of the Purple Heart"]

[2]McCloud apparently filed one earlier application for disability benefits that he may not have pursued. [Tr. at 60, 83.]

both shoulders.  [Tr. at 68].  He further claims these impairments limit his ability to work because they interfere with his concentration, and prevent him from lifting, standing or walking.  [Tr. at 68.] His application for benefits was denied initially and on reconsideration.  [Tr. at 31-34, 38-41.]

On December 8, 2004, Administrative Law Judge ("ALJ") Barbara L. Perkins held a hearing, at which time McCloud was present and represented by counsel.  [Tr. at 13, 261.]  McCloud was 59 years old at the time of the ALJ hearing.  [Tr. at 265.]  In a decision, dated January 19, 2005, Judge Perkins found that McCloud was not eligible for benefits during the applicable period, *i.e.,* from February 15, 1998 (date of onset) through June 20, 2003 (date McCloud was last insured for DIB). [Tr. at 13-20.]  On April 27, 2005, the Appeals Council denied McCloud's request for review.  [Tr. at 4.]  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

it "significantly limits his physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, he is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11]

## **Standard of Review**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir.

---

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## ALJ's Written Decision

After reviewing McCloud's testimony, medical records, symptoms, and complaints, the ALJ rejected his claim for DIB in a written decision that the Court finds inconsistent, contradictory and, at times, confusing. [Tr. at 13-20.] For example, the ALJ writes:

> in spite of his medically determinable impairments, Mr. McCloud has retained the physical capacity for light work activity.  Given this residual functional capacity, he would be unable to perform his past work, as that work is generally performed in the national economy. 20 C.F.R. § 404.1520(f).  Mr. McCloud's substance abuse has continued to cause significant limitations in function since September 20, 2000; however, because of physical limitations that would render him "disabled" under regulation regardless of ongoing substance abuse, substance abuse is not a contributing factor material to a determination of disability in this case.

[Tr. at 14.]  This paragraph occurs near the beginning of the ALJ's opinion.  The Court reads it to mean that the ALJ found McCloud was disabled because of "physical limitations" and that his substance abuse was not a contributing factor.  In other words, even if McCloud were not a substance abuser, his physical limitations would render him disabled.

Yet, the ALJ's decision announces an "unfavorable" decision.  [Tr. at 13.]  Moreover, the ALJ makes express written findings later in her opinion that seem to conflict with the above-quoted paragraph.  The ALJ concluded:

> Claimant has the RFC to perform light work from a physical standpoint; however, he has marked limitations in concentration, persistence, and pace because of mental impairments . . . which would preclude past work and any other work existing in significant numbers.

> Without ongoing substance abuse, the claimant would have the residual functional capacity to perform the full range of light work, including the mental requirements of such work.

> Without ongoing substance abuse, the claimant would be able to perform his past relevant work, as he performed it, though not as generally performed in the national economy.

> The claimant's ongoing substance abuse is material to a finding of disability.

[Tr. at 19, Findings 6-9.]  The ALJ's finding that McCloud's ongoing substance abuse "is material to a finding of disability" contradicts the ALJ's earlier conclusion that McCloud's substance abuse "is not a contributing factor material to a determination of disability in this case."

In his motion for remand, McCloud refers to the same portions of Judge Perkins' decision and argues, *inter alia,* that the ALJ's inconsistent written decision requires a remand.  [Doc. No. 14, pp. 3, 6.] Defendant Social Security also recognized the problem with Judge Perkins' decision and agrees that the ALJ found McCloud disabled early in her decision but then not disabled later in her opinion. Defendant, however, does not address the ALJ's discussion that McCloud's substance abuse was not a factor material to her determination and her later finding that substance abuse was a factor material to the decision.  Instead, Defendant argues that the ALJ performed a proper drug addiction and alcoholism (DA&A) analysis because the judge ultimately determined that McCloud was disabled but that he would not be disabled if he stopped using drugs and alcohol.  [Doc. No. 15, pp. 10-11.]

The Court is unpersuaded by Defendant's argument and determines that it cannot review the decision as written.  If this were the only problem, the Court would remand solely for clarification as to the DA&A analysis and the inconsistency in the written decision.  However, since the Court has other concerns with certain aspects of the analysis, the Court proceeds with its review.

In this appeal, McCloud argues:  (1) the ALJ improperly resorted to the use of boilerplate language at step 3 and failed to perform the required analysis with respect to Listing § 12.06 (anxiety disorder) at step 3; and (2) the ALJ failed to perform a proper step 4 analysis with respect to the RFC finding; and (3) the ALJ failed to develop the record properly regarding McCloud's service-connected disability rating of 100% from the VA.  [Doc. No. 14.]

Respondent argues that the ALJ's findings are supported by substantial evidence and that her determination is consistent with regulatory criteria and in accordance with relevant case law. [Doc. No. 15.] Thus, according to Respondent, the ALJ's decision should be affirmed.

### Summary of McCloud's Medical Condition and Treatment

*1998 Medical Records*

McCloud's medical records begin in 1998, after the alleged date of onset – February 15, 1998. McCloud contends that the onset date of disability was the last day he worked for the cable company as a "cable helper."  He sometimes alleges that he was fired after found sleeping on the job, and at other times asserts that he left the job for "health reasons."  [Tr. at 14, 15, 68, 134, 139.]

On about August 27, 1998, McCloud was hospitalized for several days at the Veteran's Administration ("VA") Medical Center in Albuquerque, New Mexico.  [Tr. at 125, 139.]  Upon admission, McCloud reported that he had filed a discrimination complaint against his prior employer. He also stated that he had been carrying a weapon, but that his uncle, another veteran, took the weapon away.  McCloud's alleged impairments were alcohol and substance abuse and leg problems stemming from his military service.  McCloud had been taking care of his brother, a disabled vet, in Texas for the past six months.  At the time of his August 1998 hospitalization, McCloud was having considerable difficulty with substance abuse and was very frustrated with his lack of success in remaining sober.  Within 20 minutes after this consultation began, McCloud had his head in his hands and was sobbing.  He stated that he hoped it was not too late for him.  He felt suicidal but wanted help.  He felt homicidal but had no current intent to harm others.  He was described as "severely depressed" and voluntarily agreed to admission.  [Tr. at 140-41.]

8

McCloud was diagnosed with substance dependence, secondary to complaints of depression and homicidal ideation.  [Tr. at 139.]  He also complained of sleeplessness, anhedonia,[12] guilt, decreased appetite and weight loss of 15 pounds.  He stated that he had used crack cocaine since he was 36 years old, thus for about 17 years; he had been a drinker since the age of 17, or for 36 years (pre-dating his military service in Vietnam).  McCloud reported that he had been married four times and that he recently had driven to Albuquerque, leaving his wife in Texas without informing her that he was going to Albuquerque.  The VA Occupational Therapist's note states that McCloud reported symptoms of PTSD.

McCloud also told the Occupational Therapist that he had a Bachelor's Degree in education (which does not appear to be true), had played professional football two years ago and had trained for the Green Berets.  The therapist questioned the accuracy of this information.  She described McCloud as impulsive, poor at problem solving and life planning and lacking in insight.  Sobriety was a long-term goal; relapse prevention a short term goal.  [Tr. at 139.]

While hospitalized, McCloud spoke to another VA provider, Dr. Elek.  McCloud reported that he was in a "special ops" unit with the Green Berets and that he went into villages in Vietnam to destroy, "kind of like Chuck Norris."[13]  The record notes that he was asking to be considered for "ETS . . . or . . . PST . . . oh, PTSD."  McCloud was uncertain whether he was staying in the Albuquerque area but he thought his marriage was over.  He stated that he had a 50% disability for his leg but that a VA doctor somehow had that rating lowered to 20% because McCloud refused another operation.  McCloud explained that he was shot in the leg three times but was able to play

---

[12]Anhedonia is defined as a total loss of feeling of pleasure in acts that normally give pleasure. Dorland's Illustrated Medical Dictionary (26th ed.), p. 80.

[13]No service records confirm McCloud's rank, assignments, mos, medals, or training.

in the NFL by ignoring the pain.  [Tr. at 139.]  He wanted to "hang out" until December when Greyhound was hiring bus drivers.  When asked how he would avoid abusing drugs or alcohol as a bus driver, McCloud said "he would do a lot of meditating."

There is another VA record dated August 31, 1998 that documents social worker Gary Eby's meeting with McCloud. This record notes that McCloud had a service-connected disability rating of 20% for his knee and thigh muscle.  McCloud reported flashbacks and nightmares but had never been treated for PTSD.  Again, McCloud stated that he had his BA in education and that he had taught several years before quitting.[14]  He told his social worker that he played football for the NFL for two years.  He denied any legal or health problems (yet he told another provider he had a lawsuit against his previous employer).  [Tr. at 138.]  McCloud admitted to abusing cocaine and alcohol and that he had a past history of marijuana abuse.  This record notes that he last used cocaine three weeks ago, while other VA records indicate he last used cocaine six days before his admission.

Another VA record notes that McCloud had a history of orthopedic problems, psychosocial and environmental stressors, and unemployment and marital problems.  [Tr. at 125.]  His GAF was 40,[15] the year before it was 60.  [Tr. at 126.]  McCloud was increasingly depressed and angry since fired from his job several weeks earlier.  He was feeling suicidal and homicidal, but instead of acting on his feelings, he drove to Albuquerque where his mother resided.  [Tr. at 125, 140.]  He reported

---

[14]McCloud asserts that he is a "certified" teacher who has taught in New Mexico and Oregon.  However, some of his records show only two years of college and none of his records confirm having received state certification for teaching.

[15]A GAF between 31 and 40 represents "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work ....)"  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Text Revision 2000)

having problems with his wife.  He also stated that he had last used cocaine six days before his admission and had not been drinking for a week.  McCloud said that he was taking Zoloft for depression since February 1998 (although there are no medical records before August 1998).  He had never been in treatment for substance abuse; he denied hallucinations.  The health care provider noted that McCloud "does endorse symptoms of PTSD, including intrusive thoughts, increased ___[16] and nightmares."  [Tr. at 126.]  McCloud's toxicology screen that day was positive for cannabis.  [Tr. at 127.]  He was to obtain an evaluation for PTSD and outpatient help for alcohol and substance abuse.  [Tr. at 127.]  Upon discharge, McCloud's medications were Zoloft and Trazodone.[17]

A VA record, dated August 31, 1998, states that McCloud was ready to be discharged.  He was determined to quit using drugs and drinking.  He planned to stay with his mother for one month and then return to his wife in Texas.  He asked for a PTSD consultation.  [Tr. at 137.]

On September 1, 1998, VA social worker Tilda Bulanon-Chavez met with McCloud and performed a psychosocial assessment.  Bulanon described McCloud as "20% service connected (for medical) noncombat vet who was in the Army from 7/67 to 5/69."  [Tr. at 136.]  (Other records indicate that McCloud did see combat during his tour in Vietnam [Tr. at 203]).  McCloud was considering participation in a substance abuse treatment program in Big Springs, Texas when he returned.  He stated that he had a monthly disability income and that his wife worked full-time (although other records indicate McCloud reported his wife was also on disability of some sort [Tr. at 134]).

---

[16]While the medical record leaves a blank space next to "increased," it appears that the note should have read "increased guilt," based on earlier notations in the record.  [Tr. at 126.]

[17]Trazodone is an "[a]ntidepressant medication . . . used to treat a variety of conditions, including depression and other mental/mood disorders. These medications can help prevent suicidal thoughts/attempts and provide other important benefits."  www.webmd.com

On September 1, 1998, the VA performed a PTSD assessment on McCloud. He was seen for one hour during an initial screening. The record notes that McCloud was "desperate" to get help for substance abuse and "maybe for PTSD". He complained of problems with anger and temper control, sleep, nightmares (including dreams of firefights and his weapon not firing), night sweats, hypervigilance, and social isolation. [Tr. at 134.] He had never been evaluated for PTSD before. McCloud reported he had five children but no contact with any of them. "Veteran is 20% service connected for a thigh muscle injury and knee condition." [Tr. at 134.] He relapsed to crack cocaine and marijuana use after he lost his job and was unable to stop abusing drugs on his own. McCloud indicated an interest in treatment for PTSD either in Albuquerque or Big Springs, Texas. The record notes that McCloud did not have his DD214 (military discharge documentation) but that he reported having served in the Army and one tour in Vietnam. He said his service-connected disability resulted from gunshot wounds incurred during combat. When asked about specific traumatic events, he noted the loss of good friends but would not discuss it further.

The interviewer found that McCloud presented himself as "cordial, dependent, impulsive and anxious to maximize utilization of treatment resources." "Veteran obviously impatient to be evaluated and treated for PTSD and SA (substance abuse)." However, this interviewer's review of previous progress notes written by different VA providers over this period of time reflected inconsistent reporting by McCloud. His primary problem, according to this social worker, was polysubstance abuse which she felt clearly needed to be addressed before beginning any in-depth treatment of PTSD. [Tr. at 135.] The social worker found McCloud evasive and stated that she would definitely want to see the DD214 before continuing the clinical assessment. A clinical interview was scheduled with Dr. Vosburgh on October 8, 1998. [Tr. at 135.]

It appears that McCloud attended an outpatient occupational therapy program for a few days after his hospitalization in September 1998. He stated that he would attend a 30-day substance abuse program but it does not appear that he did. [Tr. at 133.] On September 17, 1998, the VA attempted to contact McCloud by telephone but could not locate him. [Tr. at 133.]

On September 29, 1998, Dr. Maurice Rol of the VA performed a biopsychosocial evaluation of McCloud. Dr. Rol described McCloud as a 53-year old married male combat vet with PTSD and polysubstance abuse. [Tr. at 131.] He complained of depression, anger and relapse with alcohol and cocaine after losing his job of three years. McCloud had had many jobs since leaving the service and stated it was a "blow" to him to have lost this last job which he had held the longest. He also complained of more frequent nightmares, flashbacks, hypervigilance and self-isolation. McCloud had remained abstinent from cocaine since his discharge from the VA hospital but said he had had about 12 beers in the last 3-4 weeks. Before hospitalization, McCloud reported that he drank up to a case of beer each day. The Trazodone he was prescribed had helped his sleep problems. When he awoke in a panic now, it was less intense. He described having no treatment for psychological problems before his hospital admittance and no history of suicidal ideation or violence. [Tr. at 132.] He reported injuries to his legs from combat that resulted in multiple surgeries.

Dr. Rol described McCloud as "well-groomed, socially appropriate, depressed, irritable, anxious." McCloud demonstrated clear thoughts, reported intrusive traumatic memories and denied suicidal or homicidal ideation or hallucinations. He was unable to repeat four digits backwards on two attempts and unable to do serial 7's or serial 3's. His anxiety was clearly interfering with his ability to concentrate. Dr. Rol found his judgment to be good. He diagnosed McCloud with PTSD, alcohol and polysubstance abuse, marital problems. McCloud suffered war injuries to his legs. He

was assigned a GAF of 48.[18]  [Tr. at 133.]  McCloud was moving back to Big Springs, Texas.

Nothing in this record describes whether Dr. Rol had McCloud's DD214 or whether he found

McCloud generally credible.

On October 14, 1998, McCloud reported for his PTSD Assessment.  The day before, he had

missed his scheduled clinical assessment with Dr. Vosburgh.  McCloud stated that he was relocating

to Texas that Friday and wondered about obtaining a referral to the VA in Big Springs, Texas.  He

was seen for only 30 minutes that day for assessment purposes.  [Tr. at 130.]

On November 2, 1998, VA clinical psychologist Ellen Mink, performed a psychological

assessment of McCloud.  [Tr. at 203.]  Her report states that according to a review of the medical

record and McCloud's C-file (military service claims file), McCloud currently had a 20% service-

connected disability rating for his thigh muscle injury and knee condition from shrapnel and torn

cartilage.  [Tr. at 204.]  The C-file confirmed that McCloud suffered these injuries during combat in

Vietnam.  Mink noted that while McCloud's C-File was available to her, it did not contain much

information regarding PTSD.  McCloud was, however, being assessed for PTSD on this date.

McCloud reported to Mink that he had not been hospitalized before August 1998 when he

was admitted to the VA Hospital in Albuquerque for extreme stress.  He stated that he was in the

Army from July 1967 to May 1969.  He was in the infantry and stationed in Bawon, with his base

camp located in Da Nang.  McCloud had witnessed horrific killing – "just killing . . . lost lots of my

friends how got killed and mutilated . . . nasty conditions."  When pressed for more information,

McCloud became very emotional and tearful and stated he could not talk about it.  [Tr. at 204.]  He

---

[18]A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." (emphasis omitted).  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Text Revision 2000)

expressed survivor's guilt and said that he felt very responsible for all of the killing that occurred. His C-file documented that McCloud was in mortar fights. He described his worst experience as being when he and others were overrun – "it just seemed like an ocean of people kept coming and coming . . . a lot of people died." [Tr. at 205.] McCloud returned to the United States with an honorable discharge. His mother took him to a hypnotist, which he was grateful for because he wanted help in forgetting most of his experiences in Vietnam.

McCloud felt that the only thing he knew how to do upon returning to the United States was to kill. He was very angry and felt he was a danger to himself and others. Even when he heard loud noises now, he became upset and hypervigilant. He reported to Mink that about five years ago, he finally stopped carrying a weapon. Before then, he carried a .32 automatic. [Tr. at 205.]

McCloud also stated that before the military draft, he was attending his second year of college for dental school. It was too expensive to continue school upon his return so he studied to become a teacher. He was accredited as a teacher and taught for one year in Albuquerque, and another year in Portland, Oregon.[19] McCloud had difficulties on the job and quit, mainly because he said he was very strict in his approach to discipline. He stated that the schools changed the rules which resulted in giving too much authority to the students. After quitting teaching, McCloud learned to drive a truck, but he had difficulties with this job, too. He said that he felt like he was "hanging on edge by a branch." He admitted to Mink that his last job had been in early 1998 when he was terminated for sleeping on the job. McCloud explained that he had come back to work too quickly (after a medical release, for which there is no documentation), and ended up dozing off while at work. He felt he

---

[19]The record conflict on whether McCloud has a BA degree or only two years of college impacts this testimony as both New Mexico and Oregon require, *inter alia*, a bachelor's degree for licensure/certification. *See* http://www.uky.edu/Education/TEP/us (certification requirements for 50 states).

should have received a reprimand for his first offense but instead was fired.  McCloud stated that he had had over ten jobs and had lost count.  [Tr. at 205.]

Mink observed that McCloud was a very slender build and had difficulty keeping eye contact. He was married four times and had five children.  He reported receiving the Purple Heart three times, the Bronze Star, the Silver Star and other awards.  His mood was depressed, and his affect blunted. There was no evidence of delusions, paranoia, suicidal ideation, homicidal ideation, or thought disorder.  McCloud was easy to anger and lashed out.  His life had gone downhill since Vietnam.  He had used marijuana while in Vietnam and cocaine off and on.  However, he had not used alcohol or drugs since his August 1998 hospitalization.  McCloud was oriented to person, place and time.  He suffered from some memory loss and demonstrated an average range of intellectual functioning. There did not seem to be evidence of panic attacks.  His speech was logical and goal-directed. McCloud suffered from sleep problems.

Mink noted that McCloud had had operations on the gunshot wounds to the right side of his leg, which still bothered him.  He suffered from nightmares that included violent experiences where everyone made it out of combat except him.  McCloud woke up from these nightmares sweating and afraid.  He lashed out at his wife and had trouble controlling his anger.  He would not watch military movies and generally would not talk about his service experience.

Mink concluded that McCloud suffered serious social and occupational impairments dating to his Vietnam experiences, not only as demonstrated by his having had four marriages but also in terms of not completing his intended course of studies and never being able to hold a job.  There was a steady downward coast in employability.  [Tr. at 207.]  McCloud experienced very intense psychological distress at any exposure to events that occurred in Vietnam.  He "clearly meets the

criteria for PTSD, combat-related." [Tr. at 207.] Mink diagnosed him with PTSD combat-related, severe, chronic. She assessed a GAF of 40. [Tr. at 207.]

McCloud's November 5, 1998 x-rays of his knees showed past injuries to both knees "R/O traumatic arthritis." The radiologist compared these results to x-ray results from 1995. There were advanced changes in degenerative arthritis in his right knee that were more severe than shown in 1995. His left knee had less advanced changes of degenerative arthritis but the results were still more severe than those shown in 1995. [Tr. at 216.]

On November 5, 1998, VA Dr. Anandaraman examined McCloud. She did not have his medical records for review. McCloud reported that he suffered a gunshot wound to his left knee and multiple shrapnel injuries to his right knee while in combat. He underwent multiple surgeries on both knees, "six surgeries on each knee from 1968-1987." [Tr. at 200.] The initial surgeries on both knees took place in Japan. Subsequent surgeries were performed in Portland, Oregon and Loma Linda, California. McCloud complained of pain, weakness, stiffness, swelling, heat and redness, instability and giving away, locking, fatigability and lack of endurance. He presently had intermittent pain in both knees, some weakness and considerable stiffness in both knees. His present medical treatment consisted of "Chlorazazone" for muscle relaxation and Sulindac.[20] [Tr. at 200.] McCloud suffered from flare-ups of joint disease which were considerably severe, lasting two to three months. The flare-ups were precipitated by excessive standing and walking, and alleviated by using "Icy Hot", "Ben Gay" and his medications. McCloud used crutches and a brace on both knees. He did not suffer from dislocations. He was unable to stand or walk excessively or to bend or squat.

---

[20]Sulindac is used to reduce pain, swelling, and joint stiffness from arthritis. It is also used to treat arthritis of the spine, gouty arthritis, and shoulder bursitis/tendinitis. This medication is known as a nonsteroidal anti-inflammatory drug. www.webmd.com

Dr. Anandaraman's objective findings included observations of a small entry wound scar on the medial upper aspect of the left knee and an exit wound lateral to the patella.  It was well healed.  There was a 2½ inch scar on the medial aspect of the left knee that was also well healed from a past surgery.  There was tenderness on the medial aspect of McCloud's knee but no swelling.  Dr. Anandaraman observed some crepitus[21] and muscle damage.  His range of motion was 1-80 and his extension was normal.  The left knee appeared stable.  With respect to the right knee, there was a ½ inch scar on the medial side that was well healed from a past surgery.  There were multiple small circular fragment scars on the anterior and lateral sides that were also well healed.  Tenderness was elicited on the medial and lateral aspects.  No swelling was observed, but there was considerable crepitus on passive movement.  The range of motion for the right knee was 0-65; the extension was normal.  X-rays of the knees shows that the right knee had prominent spurring margins.  The left knee had irregular medial articular surfaces and considerable spurring.  There was advanced degenerative arthritic changes in both knees.  Dr. Anandaraman diagnosed McCloud with traumatic arthritis with residuals of multiple shell fragment scarring on the right knee, status post multiple surgeries in the past for traumatic synovitis[22] and relaxation of the anterior cruciate ligament.  There was traumatic arthritis in his left knee with residuals of gunshot wound, muscle group 13, status post multiple past surgeries.  [Tr. at 200.]

Between the November 1998 medical report and January 18, 2001, there are no medical records documenting any kind of treatment for McCloud.

---

[21]Defined as "the crackling sound produced by the rubbing together of fragments of fractured bone."  Dorland's, p. 317.

[22]Synovitis is defined as an "inflammation of a synovial membrane.  It is usually painful, particularly on motion and is characterized by a fluctuating swelling . . ."  Dorland's, p. 1301.

*2001 Medical Records*

There is a January 18, 2001 record documenting that McCloud contacted the VA telephone healthcare service. [Tr. at 197.] He stated he wished to come to the VA in Waco, TX for care. He used to go to the VA in Big Springs, Texas, but said they could not pay for his travel. The interviewer noted a 70% service-connected disability rating from a knee condition, PTSD, scars and a muscle injury, but it is not clear whether this is only a subjective report or whether there was independent confirmation of the rating. McCloud was described as alert, friendly and cooperative. His medical history included traumatic injuries to both knees. He had had surgical procedures done on both knees six years earlier. His knees swelled at times, were sore and stiff. He described the pain level to be a 7-9 on a scale of 10. He suffered from "buckling" of the knees. McCloud also complained about pain in his left elbow and shoulder from a fall three months ago. He stated that his elbow was slightly swollen, tender and painful. His shoulder was stiff and sore. With respect to PTSD, he was hypervigilant and a loner. He felt compelled to "watch" everyone. He suffered from anxiety and stress. He had nightmares and did not sleep well. He denied dyspnea or fatigue. McCloud smoked ½ to 1 pack of cigarettes a day and drank 2-3 beers per day. He admitted that he "binged" every now and then. He had not attended any substance abuse programs. The plan was to get blood work done and some x-rays of his knees and shoulders. [Tr. at 197.] It is not clear whether all of this information was provided by McCloud or if the VA telephone contact person had access to his VA medical records.

On January 25, 2001, McCloud was seen at the VA eye clinic. He denied eye pain, discomfort or changes to his vision. [Tr. at 183.] He was also x-rayed on January 25. The elbow x-ray showed moderate size osteophyte degenerative changes, but the results were mostly normal.

[Tr. at 213.] The shoulder x-ray showed minor abnormality. There were some degenerative changes and osteophyte changes, but the x-ray was otherwise negative. [Tr. at 214.] McCloud's knee x-rays showed moderate degree osteophyte degenerative changes to the right knee and minimal degree osteophyte changes to the left knee. [Tr. at 215.]

On January 25, 2001, McCloud was given a new patient orientation at the VA in Waco, TX, and the record notes he intended to speak to the Veteran's Benefits Counselor. [Tr. at 195.] He was seen by a nurse on January 25. He reported having fallen about two months ago when he landed on his left elbow and shoulder. He stated his pain was a 9 on a scale of 10. He was unable to sleep on his left side. McCloud took Advil and Aleve but when the medications wore off, the pain returned. He had not seen a doctor at the time of his fall. The record indicates that McCloud drank beer–"an undisclosed amount." McCloud reported that he felt depressed lately and drank and smoked to help with his depression. [Tr. at 192.]

There is another VA nursing note dated January 25, 2001 documenting McCloud's medical history which included several surgeries on his knees 8-10 years ago, "surgeries bilateral CPS," and ganglion cyst removal from his left wrist." McCloud's medical conditions were listed as traumatic arthritis to his knees, a thigh muscle injury while in Vietnam and PTSD. He complained of occasional headaches when stressed and muscle spasms in his knees and shoulders. This record notes that McCloud was married and lived with his wife, had grown children, was unemployed, and received VA disability. McCloud drank a case of beer weekly and sometimes drank hard liquor. He was clean and neat looking. The medical assessment was traumatic arthritis in McCloud's knees and shoulder, muscle spasms, and PTSD. The health care provider wished to obtain McCloud's medical profile from the VA in Big Springs. She instructed McCloud to go to the mental health clinic for treatment

of his PTSD.  She also indicated that McCloud needed to reduce his alcohol intake and to start exercising.  [Tr. at 189.]

There are no additional medical records until June 1, 2001.  At this time, Dr. Garces, a VA psychiatrist saw McCloud.  The record notes that McCloud was married, that he came in unscheduled that day and needed a refill for Trazodone.  McCloud stated that he was service-connected for PTSD and was treated at the VA in Albuquerque and later at the VA in Big Springs.  He had moved to Santa Anna, Texas, but needed to come to the VA in Waco.  He still had nightmares of Vietnam although not as frequently as he once did.  He lived with his wife, but his wife slept in another room because of McCloud's "thrashing around."  McCloud stated that at one time he struck his wife while he was asleep.  He felt, however, that Trazodone had helped him.  He stated he "keeps busy in his home, goes fishing and goes walking by himself."  Dr. Garces described him as alert, cooperative, neatly dressed, thinks logically, goal-directed, affect and mood unremarkable.  [Tr. at 176.]

On June 1, McCloud declined smoking cessation education.  [Tr. at 178.]  A VA record on that date shows that the nurse did not believe McCloud was taking his medications as ordered because his medications had not been re-filled.  McCloud reported intermittent exacerbations of his knee and shoulder pain but denied pain that day.  He lived about 28 miles from the Brownwood VA clinic and probably would pursue follow-up care there.  The diagnoses listed were traumatic arthritis in his knees and shoulders, muscle spasms, lipoma on his back, rectal pruritis and PTSD.  [Tr. at 181.]

On June 1, McCloud also saw a primary care physician, Dr. Mutyala.  McCloud reported that he was doing fairly well with his current medications but he requested refills on the mental health medications.  He continued to smoke ½ pack of cigarettes per day.  With respect to his shoulders,

there was no tenderness, and his range of motion was normal.  There was mild tenderness in his knees but no swelling.  With range of motion, there was slight pain.

The next two medical records for appointments on November 30, 2001 and December 3, 2001, note that McCloud was a no-show.  [Tr. at 174, 175.]

### 2002 Medical Records

McCloud was next seen by VA physician Dr. Mutyala on March 8, 2002.  The corresponding nursing record indicates that McCloud again was not taking his medications as ordered because he had not refilled them in a timely manner and the prescriptions had expired.  The record notes that McCloud missed his last appointment.  He claimed to adhere to a healthy diet but did not exercise.  He denied feeling pain in his knees or shoulders that day.  He had smoked ½ pack of cigarettes a day for the past 34 years.  [Tr. at 169.]

Dr. Mutyala noted that McCloud was there for a re-evaluation of "traumatica arthritis" in his knees.  McCloud reported that his pain was stable then.  He was sent for a blood draw to check for Hepatitis C and he was to return in 3-4 months for a comprehensive examination.  A history of PTSD was documented.  [Tr. at 169, 170.]

On July 3, 2002, McCloud was a no-show at the eye clinic and for his appointment with Dr. Mutyala.  [Tr. at 165, 166.]  On July 30, 2002, McCloud arrived without an appointment at the VA in Brownwood, Tx.  He wished to check to see if he had diabetes.  However, he decided to go to the VA in Waco.  [Tr. at 164.]

On September 10, 2002, McCloud contacted the VA through its telephone healthcare information service.  He wished to see a doctor about his toenails and was concerned he might be diabetic.  He was given an appointment with Dr. Aiyer for September 24, 2002.  [Tr. at 163.]

A September 24, 2002 nursing note indicates that McCloud was there for a routine visit.  He complained of pain in both knees and rated the pain a 7 on a scale of 10.  He stated the pain was worsening.  He had a rash on both feet and a lump on his neck.  He received tobacco cessation counseling at this time.  He indicated he did not intend to change his smoking habits.  [Tr. at 160.]  Another VA nursing record notes that McCloud had missed his November appointment, although he stated he was unaware of the appointment.  He wanted his prescription for Trazodone refilled.  He lived about 100 miles from this VA clinic.  McCloud was instructed to keep his appointments.

On September 24, 2002, McCloud was also seen by Dr. Root, a VA psychiatrist.  He was a drop-in.  He had missed his last appointment in November with Dr. Garces and had not re-scheduled.  The record notes that he is service-connected for PTSD.  He was separated from his wife at this time and reported a lot of stress due to his brother living with him and his mother's condition of Alzheimer's.  He was traveling between Texas and Albuquerque to care for his mother.  McCloud reported chronic pain and was taking Trazodone for anxiety that helped his sleep but not his anxiety.  He was having nightmares, flashbacks, intrusive thoughts and he felt the need to isolate himself.  The doctor noted that McCloud was a very nice man who seemed sincere in his efforts to care for his family.  "Sadly it appears he forgot to take care of himself first."  He was described as very stressed, anxious, depressed, with poor concentration and a low frustration tolerance.  There was a subjective decrement in short term memory and a reduced appetite.  Dr. Root started McCloud on Celexa for anxiety and depression.  [Tr. at 161.]

On September 24, 2002, McCloud was also seen by a primary care physician, Dr. Aiyer.  [Tr. at 158.]  McCloud had "lumpy swelling" in his neck for several years and arthritis of both knees which were hurting him a lot lately.  He had experienced rashes in both feet since his Vietnam service.

The doctor noted degenerative joint disease ("DJD") of both knees and referred McCloud for an orthopedic consultation. [Tr. at 158.] The x-rays of his knees that day showed normal knee joint space in his right knee with degenerative changes. The same was true for his left knee. [Tr. at 212.]

On October 17, 2002, McCloud was seen by an addictions therapist with the VA substance abuse treatment program. He had been referred by the Medical Health Center for intervention regarding his alcohol and marijuana abuse. McCloud reported that he lived with his brother then who also engaged in substance abuse. McCloud had been diagnosed and treated for PTSD. The record notes that McCloud reported he felt no consequences in relation to his substance abuse and that he saw his substance abuse as a benefit to him. The counselor provided some education and insight into the physical, emotional and mental consequences of substance abuse. McCloud had not had any previous treatment for substance abuse. The counselor reported that McCloud was not willing to receive education about substance abuse or treatment at this time. [Tr. at 157.]

On October 23, 2002, McCloud was seen for an orthopedic evaluation. He complained of bilateral knee pain starting in 1986. McCloud reported that he had had multiple arthroscopic surgeries on both knees along with an open procedure performed in 1968, and then about three arthroscopic procedures on each knee after that date. McCloud had been having episodes of severe pain in the last three to four days, especially with weather changes. On other days, he could walk three to four blocks before needing to sit down due to pain. He used crutches when he suffered from severe pain and had tried knee braces in the past without much relief. McCloud had tried cortisone injections twice eight years ago but with little help. (there are no corresponding medical records) His past medical history was recorded as PTSD. He was regularly taking Citalopram,[23] Hydroxyzine

---

[23]An anti-depressant, also known as Celexa.  www.webmd.com

(for allergies), Trazodone for PTSD, and Etodolac for arthritis.  McCloud continued to smoke ½ pack of cigarettes each day and he drank one beer every other day.  He reported being disabled in 1969, although he was able to intermittently work part-time until about five years ago.  This record notes that McCloud was 70% service-connected for a variety of complaints.  [Tr. at 154.]

The x-ray of his bilateral knees notes medial joint space bone spurring.  There was fairly marked bone spurring on his right knee.  The doctor's assessment was: DJD bilateral knees, more prominent on the right knee.  He was advised to start a regular walking program for strengthening his lower legs even if he exercised only on a limited basis.  McCloud was also instructed to do range of motion exercises and to use "therabands" to strengthen his knees.  He was to return in three months.  [Tr. at 155.]  McCloud's lab results for hepatitis C were negative. [Tr. at 209.]

On November 22, 2002, McCloud was a "no show" for an appointment with Staff Psychiatrist Dr. Garces.  [Tr. at 153.]  He also did not attend his appointment with his primary care physician on December 18, 2002.  [Tr. at 152.]  (McCloud missed two similarly scheduled appointments the last year on about these same dates.  [Tr. at 174-75])

*2003 Medical Records*

On January 23, 2003, McCloud was seen in the orthopedic clinic then for bilateral knee pain. The Physician's Assistant ("PA") noted that McCloud had shown some improvement in knee pain over time but that his ability to walk was still limited.  McCloud was doing flexion and extension exercises.  There was some improvement with the use of a hinged knee brace, but he was still symptomatic.  Thus, the PA intended to try a little more "unloading" of the medial compartment with a medial unloader brace.  A referral was made for a cane, and McCloud received some training in the use of the cane.  [Tr. at 151.]  Just as the appointment was completed, McCloud mentioned

significant neck pain with radiation to his shoulders.  The PA wrote that they could do an x-ray of the cervical spine to provide McCloud with a better opinion regarding his neck pain, but that McCloud never returned.  [Tr. at 148.]

The VA clinic attempted to contact McCloud on January 24, 2003, but was informed that he was out of town due to the hospitalization of his mother.  [Tr. at 147.]  On January 27, 2003, the VA reached McCloud.  He intended to continue with the current medications.  His neck pain was not severe enough for surgical work-up so he requested Robaxin[24] to use for pain as needed.  The PA prescribed the medication.  [Tr. at 147.]

In about February 2003, it appears that McCloud's mother passed away.  [Tr. at 113.]

On April 30, 2003, McCloud was scheduled to attend an appointment with his primary care physician, but he did not show up.  [Tr. at 146.]  A disability services "leads" worksheet records that as of May 21, 2003, McCloud was receiving VA benefits in the amount of $2200.00 per month.  [Tr. at 59.]

On June 3, 2003, McCloud filled out a disability report.  He stated that the ailments bothering him were PTSD, a sleep disorder, dislocation of both shoulders and the need for reconstruction of both knees.  McCloud's concentration was affected as well.  He was unable to stand or walk for long distances and could not lift.  [Tr. at 68.]  These illnesses first bothered him on June 19, 1969.  He was unable to work as of February 15, 1998 and on this form, he stated that he stopped working in February 1998 due to "health reasons."  [Tr. at 68.]

---

[24]"This medication relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries."  www.webmd.com

McCloud's job history was as a driver from 1984-88; supervisor/helper for a tile company from 1995-96; supervisor for a cable company from 1996-96. [Tr. at 69.] He described all of these positions as requiring mostly sitting but not much walking or standing. He did not handle, grab or grasp objects in relation to those jobs, and there was no carrying or lifting.

McCloud noted that he was seen by the VA in Waco, Texas from 1993-2002 (even though there are only a few medical records in 1998, 2001, and 2002). [Tr. at 70.] He had received new knee braces, medications and a walking cane. He listed a number of medications, including Trazodone for help sleeping and to cope with nightmares; Acetaminophen for pain and infections; Sulindac for arthritis; Cephalexin (anti-biotic?); and Hydroxyzine (for allergies). [Tr. at 73.] He stated that he completed two years of college in about 1970. [Tr. at 74.]

On June 18, 2003, McCloud filed his application for DIB, alleging an onset date of February 15, 1998. [Tr. at 60-62.] On the application, he agreed that he did not work from 1974-1976 and worked only sporadically from 1977-1988. He worked for many different employers and had many periods of unemployment. He did not work during part of 1995 and stopped working in 1998.

As of June 30, 2003, the ALJ found that McCloud no longer met the insured status requirements. Thus, with respect to his disability application, he was required to show he was disabled on or before June 30, 2003. [Tr. at 14.]

During McCloud's face-to-face interview with the disability field office, no problems were noted. McCloud did not have problems answering questions. However, he did have a brace on his right leg that worked with hinges. He also had a cane that he was using that day. [Tr. at 84.]

On June 19, 2003, McCloud filled out a work history report. He generally listed the same jobs that he reported in his disability report. [Tr. at 86-89.] On his daily activities questionnaire,

McCloud described his average day as consisting of taking a shower, eating breakfast cereal, and no work or exercise. [Tr. at 94.] He attended VA appointments, could drive and could shop for food and medications. He did not need assistance getting to places but sometimes needed a cane. He prepared TV dinners, sandwiches, and fast food. His activities consisted of church and playing checkers. [Tr. at 95.] McCloud was able to water the plants but could do very little household work. He tended to lose track of what he was doing. His hobbies were art and drawing and watching television. He read a little and watched TV daily for entertainment and companionship. [Tr. at 96-97.] McCloud described himself as a "loner". People dropped in to visit on occasion. He stated that he sometimes had trouble getting along with people. [Tr. at 97.]

McCloud had no difficulties sleeping after he took his medications. He did not need assistance with personal grooming. [Tr. at 98.] Under the section "emotional problems," he circled depression, anxiety, anger, losing control of anger, and concentration. By way of explanation for these problems, McCloud wrote "stress, war trauma PTSD." He also stated "the disrespect Vietnam vets get daily; the loss of my mother my whole WORLD". [Tr. at 99.] He reported that he was hospitalized in Albuquerque at the VA medical center on the "mental floor." [Tr. at 100.] He was unable to walk one block without stopping. He could slowly climb stairs and used a cane because of his knees. He sometimes had trouble combing his hair and putting away groceries. Fatigue was not a problem. [Tr. at 101-102.] Under the section asking if McCloud would attend an exam or test scheduled by disability services, McCloud marked "no" and wrote "VA only." [Tr. at 102.]

In the record, there is a "Function Report" for a third party to fill out. It was signed by Jerry Spicer on August 10, 2003, but the 9-page form contains no information. [Tr. at 104-112.]

On September 2, 2003, Dr. Eugene P. Toner provided a consultative musculoskeletal evaluation of McCloud.  On the intake form, McCloud wrote "disable from war 'nam'".  [Tr. at 217.] He also indicated that he lived alone and spent his day doing nothing but worrying about upcoming surgery on his knees.  He stated that he could stand for 30 minutes, sit for one hour, drive for one hour, and walk 1½ to 2 blocks.  McCloud tended to lie down during most of the day but was able to lift items weighing 20-30 pounds.  [Tr. at 217.]

Dr. Toner's exam notes indicate that McCloud's general appearance was "well muscled, unsmiling, unsure of answers."  [Tr. at 219.]  McCloud favored his right leg in walking.  His hands were calloused and dirty.  Dr. Toner conducted an orthopedic and neurological exam which consisted of checking off boxes.  Very little was written on the form.

Also on September 2, 2003, Dr. Toner filled out a Medical Source Statement of Ability to Do Work-Related Activities.  [Tr. at 220.]  Dr. Toner marked the "no" box with respect to every possible limitation, including lifting, standing, walking and sitting.  [Tr. at 221.]

Dr. Toner provided a typewritten report regarding his September 2 examination of McCloud. [Tr. at 222.]  Dr. Toner noted McCloud's history of being injured in 1968 in Vietnam from gunshot wounds to both knees and to his right side.  McCloud reported that he had had surgeries on his knees. Dr. Toner stated that McCloud was unclear as to the exact nature of his injuries but has been told that he is going to need knee replacement surgery in the near future (there are no corresponding medical records).  [Tr. at 222.]

Dr. Toner noted that McCloud had dislocations of his right and left shoulders that appeared chronic in nature.  McCloud went to a physician to get those reduced and the last time this occurred was a year ago.  McCloud lived alone and performed no chores during the day.  He told the physician

that he spent his day watching television and listening to music.  McCloud had someone come in to do his cleaning, laundry and cooking.  He could make his own sandwiches and sit outside.  Dr. Toner noted that since the beginning of 2003, McCloud had had two visits to a medical doctor.  He was last seen in March (there is no corresponding record) and stated he took several medications but could remember only the name of Trazodone.  He also took a medication for pain but could not recall the name of it.  Dr. Toner's assessment was that while McCloud complained of bilateral shoulder pain with decreased range of motion, there was no evidence of any neurovascular deficits in his arms. McCloud also complained of bilateral knee injuries but there was no evidence of "laxity, effusion, or deformities."  In sum, Dr. Toner concluded that McCloud's complaints "are far in excess of objective findings and I also have some concern about his severe myosis.  Dr. Toner wrote that McCloud did not bring his medication with him.  "He is on some type of opiate, however without medical records I am unable to make any comments as to whether this medicine has been medically made available for him."  [Tr. at 223.]

Dr. Toner further found that McCloud's physical stature is one of good musculature and that his hands were dirty and callused which were inconsistent with McCloud's reports that he watched television and listened to music all day long, nor were these reports consistent with the reported extreme weakness to his shoulders and lower extremities.  Dr. Toner concluded that there was nothing in the examination that indicated McCloud was unable to "do things that would be considered normal for his age, size, and sex."  [Tr. at 222.]

On September 19, 2003, Dr. Green performed a PRFC Assessment of McCloud.  The primary diagnosis was DJD of the knee.  The secondary diagnosis was DJD of the shoulders "by history." [Tr. at 224.]  McCloud's exertional limitations were occasional lifting of up to 20 pounds and

frequent lifting of up to 10 pounds.  He could stand or walk for 6 hours, sit for 6 hours and his ability

to push or pull was unlimited.  Dr. Green reviewed prior  results of x-rays taken of McCloud's knees,

elbow and shoulder and other VA medical records.  Dr. Green assessed McCloud with occasional

postural limitations in all categories (climbing, balancing, stooping, bending, crouching, crawling).

He was limited in his ability to reach in all directions but unlimited in his abilities to handle, finger,

or feel.  There were no limitations in McCloud's vision, communication abilities or environment.  Dr.

Green checked the box "yes" to indicate there were treating physician's conclusions in the record with

respect to restrictions that were significantly different than the restrictions found by Dr. Green.  [Tr.

at 230.]  Yet, it does not appear any other treating doctor formally assessed McCloud's physical

functional capacity or his limitations.  Dr. Toner was not a treating physician.

On September 23, 2003, Dr. Rene Gonzales performed a consultative psychiatric exam of

McCloud.  [Tr. at 232.]  McCloud reported that he suffered from nightmares and could not sleep well

because of his experiences in Vietnam.  He also mentioned that he had been very depressed.  He had

been seen off and on by a psychiatrist at the VA since he left Vietnam (there are no corresponding

medical records) and was seen by a therapist with the VA but had not seen a mental health care

provider in the last year.  McCloud complained of current depression, feelings of hopelessness and

helplessness, fatigue and low self esteem.  He was taking medications like Thorazine and Trazodone

and medications for stress but did not recall the names.  He stated that he was taking at least ten

medications he obtained through the VA.

McCloud had just moved to Albuquerque in May 2003 and had not seen any of the doctors

at the VA since his move.  He had not obtained any mental health treatment from the VA.  Overall,

he suffered from depression and also had physical problems that affected his life.  McCloud reported

knee problems and related chronic pain. McCloud told Dr. Gonzales that he was service-connected for 100% disability for his physical and emotional problems. [Tr. at 232.] He also told the consultative physician that he drank as much alcohol as he could get a hold of and that he had been drinking for the past 30-40 years. He had experienced some blackouts in the past but no seizures. McCloud had treatment for alcoholism on one occasion several years ago. He reported that he smoked marijuana once a week and had smoked for 40 to 50 years. McCloud complained of relating to people. [Tr. at 233.]

Dr. Gonzales' mental status exam indicated that McCloud was cooperative, related well, able to answer questions appropriately. His eye contact and psychomotor activities were mildly decreased. His dressing and grooming were appropriate, and he appeared his age. McCloud's speech and language intensity were soft, his pitch was normal and his rate was slow. He was coherent, did not have any aphasia, neologism, echolalia, stammering or clanging. His vocabulary and diction were appropriate. McCloud's mood was depressed and his affect was flat. He showed a depressive trance, and his concentration and attention appeared mildly impaired. There was no indication of suicidal or homicidal ideation. His IQ appeared to be "low average." He did not suffer from hallucinations. He was alert and oriented. His memory (immediate, recent and remote) was mildly impaired. McCloud had some trouble remembering things that happened within a few days and with long term events. Dr. Gonzales found that he had insight about his problems and that his judgment was normal.

The diagnoses were: Axis I - major depression, recurrent; PTSD, alcohol and marijuana abuse; Axis II- deferred; Axis III - knee and back problems; Axis IV - moderate; Axis V - GAF 45 and for past year 60. [Tr. at 233.] Dr. Gonzales concluded that McCloud was able to take care of basic activities of daily living and to manage his financial affairs. The exam showed a depressed mood, no

psychosis and mild memory problems. There were no major somatic complaints except for sleep problems and some weight loss. [Tr. at 234.]

In the psychiatric/psychological source statement of McCloud's ability to do work related activities, Dr. Gonzales found mild limitations in understanding, remembering instructions, detailed or complex instructions and no limitations in handling very short and simple instructions. There were no limitations in his ability to sustain his concentration and in task persistence, ability to carry out instructions, and ability to work without supervision. McCloud was assessed with mild limitations in his abilities to attend and concentrate and to engage in social interactions. [Tr. at 234.]

Dr. Gonzales noted that alcohol and other substance abuse was a problem. McCloud was able to manage financial benefits as long as he maintained sobriety. He had some physical problems that might interfere with his ability to hold a job. Dr. Gonzales' treatment recommendations included individual and family therapy, participation in the VA's PTSD program, and appointments with a psychiatrist for medical management. Dr. Gonzales emphasized that McCloud needed to maintain sobriety. He also recommended that he see an orthopedic doctor to determine the severity of his physical problems. [Tr. at 234.] McCloud's prognosis was guarded with respect to his psychiatric problems provided he followed the above recommendations and guarded with respect to physical problems depending on the findings of the orthopedic physician.

On October 28, 2003, the disability services denied McCloud's underlying application for DIB, noting that he was given a light RFC, dated September 19, 2003 and a non-severe PRT. [Tr. at 31, 35.]

On October 29, 2003, Dr. Gabaldon filled out a Psychiatric Review Technique form for McCloud, finding that McCloud's medical impairments were not severe and that his co-existing

nonmental impairment required a referral to another medical specialist. Dr. Gabaldon marked affective disorders, anxiety related disorders and substance abuse disorders. With respect to affective disorders, he stated that McCloud's major depression did not precisely satisfy the diagnostic criteria for listing 12.04. [Tr. at 238.] His anxiety related problems included recurrent and intrusive recollections of traumatic experiences. [Tr. at 240.] McCloud's substance abuse involved behavioral changes associated with regular use of substances that affected the central nervous system. Regarding the "B" factors, Dr. Gabaldon noted mild limitations in most areas. [Tr. at 245.] "Mr. McCloud admits to some depression anxiety but there is no evidence of severe functional limitations. There is no evidence of thought disorder or of a cognitive limitation. He does admit to SA. He was recently evaluated by Gonzales who noted no severe functional limitations." [Tr. at 247.]

On another form, McCloud reported he was having problems with depression and stress. He believed he was limited in his ability to sit, stand, walk and lift due to his knee and shoulder pain. [Tr. at 113.] He noted that he had not seen a doctor since he filed his DIB application. [Tr. at 114.]

McCloud also filled out a statement when he requested reconsideration. He noted that his knees were swelling up, especially his right knee. He was having problems daily in getting around. He had not seen a doctor but had an appointment. [Tr. at 120.] He was taking medications for sleep, anxiety, arthritis, muscle relaxation, allergies and pain (as needed). [Tr. at 122.]

### 2004 Medical Records

On January 8, 2004, the social security administration denied McCloud's request for reconsideration. No new evidence was provided for reconsideration. The initial denial was affirmed. [Tr. at 42.] The agency concluded McCloud could perform light work, which would include work he previously performed, as he described those job functions.

On August 18, 2004, McCloud was seen at the VA emergency room. His chief complaint was migraine headaches. He was out of his medications. Suicidal ideation was noted. McCloud felt hopeless much of the time in the last month. [Tr. at 251, 252.] An August 24, 2004 ER record notes that McCloud lost his mother and aunt six months ago and that he had been suffering headaches. He rated the pain a 10 on a scale of 10. He complained of light bothering his eyes, but no nausea. He had some numbness in his leg. He was given morphine. [Tr. at 256.]

The first ALJ hearing was set on August 24, 2004, but it appears that McCloud was in the hospital at that time. [Tr. at 13, 50.]

On December 8, 2004, the ALJ hearing was held in Albuquerque. McCloud appeared with his attorney, and a vocational expert testified as well. [Tr. at 261.] McCloud discussed his work history. [Tr. at 261-266.] He was asked to describe each of the conditions he felt made it impossible for him to work from worst to least severe. He began with "stress factors – mental and emotional – dealing with the war." [Tr. at 268.] The stress is triggered by visual, everyday scenes of soldiers. He testified that he had been in Special Forces and was wounded three different times in Vietnam,[25] during which time he lost many friends. An examples of the stress he feels is daily depression. McCloud also testified that after he lost his mother last year his life became unbearable. [Tr. at 269.] He also had issues with anger and tried to avoid people because he tended to want to retaliate if problems occurred. He stated that "Special Forces are trained specialists." [Tr. at 270.]

McCloud's attorney then asked McCloud if, when they were in the attorney's office, McCloud discussed wanting to "destroy people" from his last job at Superior Cable. McCloud responded "yes." Something frustrating had happened to him on that job and he still felt like he would like to

---

[25]It is unclear if this reference was to three separate incidents or wounds suffered during one incident.

take revenge.  However, as long as he was not around the person, he did not want to take revenge. [Tr. at 271-272.]  When asked if he had engaged in any acts of violence in his civilian life, he responded that he had once in 1983 when a person attempted to rob him.  [Tr. at 272.]  He discussed having trouble with nightmares and that the nightmares threw him into a "serious violent temperament."  He awoke from the nightmares soaking wet.  He had 3 or 4 of these nightmares in the last month and they kept him away from people because he did not want to become provoked. [Tr. at 273.]

The next problem McCloud discussed was his need to return to the doctor for total knee reconstruction of both knees.  He stated that he was at the doctor's on this date (although there is no corresponding medical record) and that he was rescheduled for reconstructive surgery sometime next year.  He said his knee problems resulted from gunshot wounds in Vietnam and that he had had seven prior surgeries on his knees.  His knees felt "lousy" and he had his cane in the car.  [Tr. at 274.] He had been prescribed a cane, crutches and braces for his knees.  The problems with his knees interfered with his ability to sit for long periods of time.  He could sit for 15-20 minutes only.  He was able to stand for 10-15 minutes if he leaned on something.  He easily lost his balance and fell.  [Tr. at 274-75.] He thought he could walk 1 ½ to 2 blocks.  His high blood pressure was controlled with medications, but his sleep was not very good.  He also had shoulder problems.  [Tr. at 275-277.] Sometimes he was able to reach but at times his shoulders popped out.  He believed that everything (knees, shoulders and elbow) would need surgery at some point.  [Tr. at 278.]

The ALJ asked McCloud about the status of his service-connected disability rating for PTSD, and McCloud responded that he was 100% disabled.  [Tr. at 278-79.]  He testified that he received notice of his disability rating in 1997 or 1998.  At this point, the ALJ began to ask the VE a

hypothetical question, but the ALJ stopped in mid-sentence and instead, asked the VE only about the exertional level of McCloud's prior relevant work.  [Tr. at 279.]  The VE testified that all of McCloud's prior jobs were classified as medium work.  There was no additional testimony by the VE and no other questions by McCloud's attorney or the ALJ.  [Tr. at 279.]

On January 19, 2005, the ALJ issued an unfavorable decision.  [Tr. at 10, 13-20.]  The ALJ noted that she had to address the issue of McCloud's longstanding history of alcohol and drug abuse. If the ALJ found that McCloud was unable to perform substantial gainful activity because of medically determinable impairments, then she must determine if his substance abuse was a contributing factor material to a determination of disability.  [Tr. at 13.]  The ALJ summarized the proper DA&A analysis, but unfortunately, as stated previously, her written decision is contradictory and confusing.

In her decision, the ALJ explained why she did not find McCloud entirely credible.  For example, she observed McCloud's allegations that he was unable to work because of mental impairments, PTSD, and physical impairments, mainly stemming from injuries to the knees and chronic dislocation of his shoulders.  But, she concluded that the medical record did not support those allegations.  He did not seek regular, ongoing medical or mental health treatment for the period under review.  [Tr. at 14.]  The ALJ noted McCloud's assertions that he had had numerous surgeries to his knees after Vietnam but that there were no supporting medical records relating to those surgeries or no medical records that preceded the onset date of disability.

The ALJ also commented that while McCloud testified at the hearing that he had a 100% service-connected disability from the VA, his disability rating was not clear.  For example VA health care providers noted that he was receiving different percentages for different impairments.  According

to the ALJ, there was no evidence in the records submitted to show such an evaluation (the 100% disability rating), nor any supporting rationale for such an evaluation. McCloud submitted no evidence regarding his VA compensation benefits, and the medical record before the ALJ revealed a relatively mild impairment affecting his knees. Notwithstanding the medical record, the ALJ noted McCloud's unsupported testimony that he was to undergo knee replacement surgery. [Tr. at 15.]

The ALJ also observed that McCloud did not always follow prescribed treatment, and that there was ample evidence in the record to conclude that his depression and PTSD symptoms were exacerbated by ongoing substance abuse. [Tr. at 17.] The ALJ concluded that McCloud had mental impairments of depression, PTSD and substance abuse disorder, as well as degenerative joint disease or "traumatic arthritis" affecting his knees "which in combination" were severe but not listing level. [Tr. at 17, 19.] In so finding, the ALJ discussed listings for several physical impairments but no listings for any mental impairments. [Tr. at 17.]

At that point, the ALJ assessed McCloud's RFC. She noted McCloud's symptoms, including pain, and the objective medical evidence. The ALJ commented that there were "many inconsistencies concerning the vocational factors in this case, particularly [his] education and his work background." While the ALJ considered the medical reports by McCloud's VA treating physicians, she appeared to discount those opinions without specifying which treating physician's reports or diagnoses she found unsupported. She explained, however, that the VA doctors' notes concerning the severity of McCloud's impairments and their effect on his ability to work consisted primarily of McCloud's subjective reports to those doctors, rather than objective medical evidence. [Tr. at 17.] The ALJ found this to also be true regarding most of the consultative physicians who examined McCloud at

38

the request of disability services.  [Tr. at 17-18.]  The ALJ was most persuaded by the report of consultative physician Toner who noted that McCloud was well muscled and had calloused hands. [Tr. at 18.]  Like the ALJ, Dr. Toner clearly did not find McCloud's complaints entirely credible.

Ultimately, Judge Perkins found that McCloud had the physical capacity to perform a full range of light work but that his ongoing substance abuse resulted in his inability to maintain the concentration, persistence and pace required to sustain employment.  [Tr. at 18.]  The ALJ was not persuaded that with abstinence, McCloud would continue to experience significant limitations in his ability to perform basic mental work activities.  With abstinence, the ALJ concluded that McCloud would have only mild limitations in activities of daily living, social functioning and mental capabilities. [Tr. at 18.]  Thus, if not for substance abuse, McCloud's RFC did not preclude him from performing any of his past relevant work as he performed those jobs.

McCloud filed a request for review with the Appeals Council, and included a letter from his attorney arguing that the ALJ's opinion was very "sloppy" and inconsistent, and that the ALJ improperly intertwined the discussion of materiality with the question of disability.  [Tr. at 259.]  The Appeals Council was unpersuaded.  [Tr. at 4, 7.]

## Discussion

The review of the ALJ's decision and this case are difficult for a number of reasons.  First, there are many references to medical treatment for which there are no corresponding records, e.g., multiple back, knee, or leg surgeries and medical care and prescriptions in February 1998 (e.g., six surgeries on each knee from 1968-1987; allegedly seen by the VA in Waco from 1993-2002). Second, McCloud's VA service-connected disability rating appears to be in dispute or unclear, and

39

was ultimately disregarded by the ALJ because of what she described as inconsistencies in the medical record.

The medical records are somewhat inconsistent and may explain the ALJ's conclusions. However, a close examination of the records does not necessarily support the ALJ's conclusion. It appears that McCloud may have had a service-connected disability rating of 20% regarding physical problems for a certain period of time, then a rating of 70% (that may or may not have included some mental impairment), and finally, a service-connected rating of 100% from the VA.

For example, in August 1998, McCloud reported that he was 20% disabled for physical impairments (even though he said he was originally given a 50% disability rating but that it was reduced due to his refusal to undergo another surgery). [Tr. at 139.] Another August 1998 medical record shows a 20% service-connected disability rating for McCloud's knee and thigh muscle injuries. [Tr. at 138.] A September 1998 medical record documents a 20% service-connected disability rating for medical problems. [Tr. at 136.] Another September 1998 medical record notes that McCloud was 20% service-connected for a thigh muscle and knee condition. [Tr. at 134.] A November 2, 1998 VA record again indicates that McCloud was 20% service-connected for a thigh muscle injury and knee condition resulting from shrapnel and torn cartilage. [Tr. at 204.]

Three years later, a January 2001 medical record documents that McCloud had a 70% service-connected disability rating from a knee condition, PTSD, and scars and a muscle injury. [Tr. at 197.] While this rating is not confirmed by VA documentation (other than medical records), it does not appear entirely unlikely based on McCloud's complaints and diagnoses of PTSD by the VA in 1998. On June 1, 2001, McCloud again reports that he was service-connected for PTSD, although he does not provide a specific rating. [Tr. at 176.] Similarly, a September 24, 2002 VA medical record

documents that McCloud was (or reported to be) service-connected for PTSD, without providing a specific rating.  [Tr. at 161.]  An October 23, 2002 VA medical record notes that McCloud was 70% service-connected for a variety of complaints.  [Tr. at 154.]

There is documentation in the administrative record that McCloud was receiving VA disability benefits in the amount of $2200 per month, as of at least by May 21, 2003.  [Tr. at 59.]  Yet, it is not clear what disability rating McCloud had then.   In September 2003, McCloud reported to a consultative physician that he was 100% service-connected for disabilities relating to physical and emotional problems.  [Tr. at 232.]  And, McCloud testified at the December 2004 hearing that he has a service-connected disability rating from the VA of 100%, which he stated he received in 1997 or 1998.  [Tr. at 279.]  Moreover, Plaintiff attached to his motion for remand a letter from the VA, dated October 20, 2005, stating that Plaintiff has a service-connected disability rating of 100%.  [Doc. No. 13, Ex. A.]  Unfortunately, that letter makes no mention of when this rating was given or if it was given during the pertinent period of review, i.e., from February 15, 1998 through June 30, 2003.  In addition, the VA's letter does state whether the 100% disability rating consists of physical and mental impairments.

The Court is concerned about the absence of certain documentation or confirmation of McCloud's alleged medical treatment and VA disability ratings.  Clearly, at a minimum, the VA has information regarding McCloud's VA disability ratings, when the ratings were given and upon what injuries or impairments they were based, yet that information is not part of the administrative record. McCloud's counsel has an obligation to gather and submit all relevant medical records and evidence. As previously noted, key information and records were not submitted, and this has complicated both the ALJ's task and this Court's responsibility.

41

There was ample objective evidence in the record suggesting the need for additional documentation of medical treatment provided to McCloud with respect to the pertinent impairments and particularly with respect to the VA disability ratings.  Where this occurs, the ALJ has a duty to develop the record.  Baca v. Dep't of Health & Human Servs., 5 F.3d 476, 479-80 (10th Cir. 1993) (ALJ has a duty to develop the record relating to another agency's disability findings).  The duty exists even if the claimant has counsel.  Id. at 480.  Thus, it was not enough here for the ALJ simply to have disregarded evidence of the VA's disability ratings because she found some inconsistencies (that are not necessarily inconsistencies based on the chronology of the case).  See Weers v. Barnhart, 2002 WL 69512 at *5 (D. Kan. 2002) (ALJ failed to fully and fairly develop the record as to the material issue of the VA disability rating and the ALJ erred in failing to explicitly consider the VA's 100% disability rating in rendering decision).

While "another agency's determination of disability is not binding on the Social Security Administration . . . , it is evidence that the ALJ must consider and explain why [she] did not find it persuasive."  Grogan v. Barnhart, 399 F.3d 1257, 1262-63 (10th Cir. 2005).  The Tenth Circuit has not stated what weight a VA disability determination should receive, but it is clear that the VA rating should receive some weight, and that passing reference will not suffice.  McClean v. Barnhart, 2004 WL 1212045 at *3 (D. Kan. May 20, 2004).  Moreover, while little weight might be assigned to a disability rating of 20%, it is improper to ignore, without explanation, a disability determination of 70%.  Id.

In this case, if the VA determined that McCloud was service-connected for 100% disability based on physical or mental impairments, including PTSD, this could have had a material impact on the disability decision.  If the VA determined that McCloud had a disability rating of 70% based on

physical and mental impairments, it would be improper of the ALJ not to explain what weight she assigned that rating. On remand, the ALJ should obtain confirmation of the VA ratings, along with dates and reasons for the ratings, and then determine the weight the ratings are entitled.

The Court will remand this case both so that McCloud's counsel may present all information and records necessary to support the claimed disability and so that the ALJ can further develop the administrative record consistent with the Court's discussion *supra*. The ALJ then has the opportunity to re-write or clarify her written decision, should she reach the same or a similar result.

Upon remand, the ALJ also should take care at step 3 of the sequential evaluation process to discuss the appropriate listings and why claimant's impairments do or do not meet those listings. The analysis should be sufficient so that the Court, if asked, can conduct a meaningful review. *See* Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). In addition, the Court agrees with McCloud that while not every record need be discussed by the ALJ, McCloud's GAF's deserve mention in determining whether he is disabled. For example, McCloud was assigned a GAF of 40 in August 1998. [Tr. at 126.] In September 1998, another medical provider evaluated McCloud's GAF to be 48. [Tr. at 133.] In November 1998, a psychiatrist again concluded McCloud's GAF was 40. [Tr. at 207.] In September 2003, according to a consultative psychiatrist, McCloud's GAF still was hovering in the same area at 45. [Tr. at 233.] While certainly not dispositive on the question of disability, these low GAF's reflect serious symptoms or impairments.

Upon remand, the ALJ should proceed by employing the proper DA&A analysis. "[T]he threshold determination is whether the claimant has demonstrated a disability at all; only if that 'condition precedent' is satisfied must the ALJ assess the role alcohol abuse plays in the demonstrated

disability." Chambers v. Barnhart, 2003 WL 22512073 at *2 (10th Cir. Nov. 6, 2003) (*citing* Drapeau v. Massanari, 255 F.3d 1211, 1214-15 (10th Cir. 2001)).

The Contract with America Advancement Act of 1996, Public L. No. 104-121, 110 Stat. 847, provides in part that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). "The ALJ must find plaintiff not disabled if alcoholism or drug addiction is a contributing factor material to his disability determination." Bainer v. Barnhart, 2004 WL 2009426 at *3 (D. Kan. Aug. 19, 2004) (citing 42 U.S.C. § 423(d)(2)(C)). The key inquiry is whether the plaintiff would still be disabled if he stopped using drugs or alcohol. Id.; 20 C.F.R. § 404.1535(b)(1). The ALJ determines which of plaintiff's limitations would remain if he stopped using drugs or alcohol. Id. If the ALJ decides that the plaintiff's remaining limitations would not be disabling, his drug addiction or alcoholism are then considered a contributing factor material to the disability determination. Id. However, if the plaintiff's remaining limitations are still disabling, his drug addiction and alcoholism are not a contributing factor material to the disability determination. Id. Under the latter scenario, the plaintiff then would be found disabled, independent of his addictions. Id.

After the enactment of this law, the Social Security Administration sent out a teletype on applying it. The teletype stated in part that "when it is not possible to separate the mental restrictions and limitations imposed by [drug and alcohol abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate." "In other words, the agency directed that if the effects of a claimant's mental illness could not be separated from the effects of

substance abuse, the abuse would be found *not* to be a contributing factor material to the disability

determination." McGoffin v. Barnhart, 288 F.3d 1248, 1252-53 (10th Cir. 2002).

Clearly, if the claimant's only impairments are drug and alcohol related, the analysis might be

straight forward.  But, the analysis is more complicated where the plaintiff has other impairments in

addiction to drug and alcohol addictions.

> The most complicated and difficult determinations of materiality will
> involve individuals with documented substance use disorders and one
> of [sic] more other mental impairments.  In many of these instances,
> it will be very difficult to disentangle the restrictions and limitations
> imposed by the substance use disorder from those resulting from other
> mental impairment(s).

Stuart v. Barnhart, 2003 WL 1054014 at *3 (D. Kan. Feb. 24, 2003) (citing Cox, Dale, Social

Security Administration, Emergency Teletype, August 30, 1996).

This case presents the more complicated and difficult determination of materiality.  McCloud

engages in ongoing and long-term alcohol and substance abuse.  According to McCloud, he was

probably abusing alcohol and drugs well before he served in the Vietnam war, and he unfortunately

continues to abuse those substances.  It is not for this Court to determine whether McCloud's

substance abuse is a factor material to the ALJ's disability findings, nor does the Court imply that the

ALJ would be unable to draw distinctions between McCloud's alleged impairments and his substance

abuse.  However, there are difficulties presented by the circumstances of this case where McCloud

appears to have seen a number of treating physicians in different VA facilities, not all of whom made

a distinction between McCloud's diagnoses of PTSD and depression and his substance abuse.  At

least one health care provider and one consultative physician noted McCloud's substance abuse as

being a primary problem, while other health care providers concentrated more on his other mental

impairments and diagnoses, without discrediting McCloud's complaints due to substance abuse.  In

45

other words, this is not a case where the medical record is replete with references that alcohol and drug abuse were 'factors material' in McCloud's tendency toward depression, PTSD, or his inability to hold a job, complete his education or maintain his marriage. *Compare* <u>Salazar v. Barnhart</u>, 344 F. Supp. 2d 723, 735 (D. N.M. 2004).

<u>**Conclusion**</u>

For all of the above stated reasons, the Court concludes that Plaintiff's motion to remand should be granted.

IT IS THEREFORE ORDERED that McCloud's Motion to Reverse and Remand for a Rehearing [Doc. No. 13] is GRANTED and that this matter is remanded for a rehearing so that the ALJ can address the issues described herein.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge